Approved: _Kaylan E. Lasky_____
           Kaylan E. Lasky / Alexander Li
           Assistant United States Attorneys

Before:    HONORABLE SARAH L. CAVE
           United States Magistrate Judge
           Southern District of New York

# 22 MAG 590

- - - - - - - - - - - - - - - - X
                           :   **SEALED COMPLAINT**

UNITED STATES OF AMERICA    :
                           :   Violations of
     - v. -               :   21 U.S.C. § 963; and 18
                           :   U.S.C. §§ 924(o), 1956,
TAKESHI EBISAWA,          :   2332g, 3238, and 2
SOMPHOP SINGHASIRI,       :
SUKSAN JULLANAN,          :
   a/k/a "Bobby," and      :
SOMPAK RUKRASARANEE,      :
                           :
     Defendants.          :

- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

      THOMAS P. McLAUGHLIN, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

## COUNT ONE
### (Narcotics Importation Conspiracy)

      1.   From at least in or about June 2019 to in or about January 2022, in Thailand, Indonesia, Japan, Myanmar, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, TAKESHI EBISAWA and SOMPHOP SINGHASIRI, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

      2.   It was a part and an object of the conspiracy that TAKESHI EBISAWA and SOMPHOP SINGHASIRI, the defendants, and others known and unknown, would and did import into the United States and

into the customs territory of the United States from a place outside thereof controlled substances, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3.   It was further a part and an object of the conspiracy that TAKESHI EBISAWA and SOMPHOP SINGHASIRI, the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute controlled substances, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4.   The controlled substances that TAKESHI EBISAWA and SOMPHOP SINGHASIRI, the defendants, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof, and (b) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, were (i) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Section 960(b)(1)(H), and (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 960(b)(1)(A).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Conspiracy to Possess Firearms, Including Machineguns and Destructive Devices)

5.   From at least in or about February 2020 to in or about January 2022, in Thailand, Myanmar, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, SOMPHOP SINGHASIRI, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly

combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

6.   It was a part and an object of the conspiracy that SOMPHOP SINGHASIRI, the defendant, and others known and unknown, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics importation conspiracy charged in Count One of this Complaint, would and did knowingly use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## COUNT THREE
### (Conspiracy to Acquire, Transfer, and Possess Anti-Aircraft Missiles)

7.   From at least in or about June 2019 to in or about January 2022, in Thailand, Indonesia, Japan, Myanmar, Denmark, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 2332g.

8.   It was a part and an object of the conspiracy that TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, would knowingly acquire, transfer directly and indirectly, receive, possess, import, and export (i) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and proceed toward energy radiated or reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft, in violation of Title 18, United States Code, Section 2332g(a)(1)(A); (ii) a device designed and intended to launch and guide said rocket and missile, in violation of Title 18, United States Code, Section 2332g(a)(1)(B); and (iii) a part and combination of parts designed or redesigned for use in assembling

3

or fabricating said rocket, missile, and device, in violation of Title 18, United States Code, Section 2332g(a)(1)(C).

(Title 18, United States Code, Sections 2332g(a)(1)(A), (a)(1)(B), (a)(1)(C), (b)(1), (b)(5), (c)(1), and 3238.)

## COUNT FOUR
### (Narcotics Importation Conspiracy)

9.   From at least in or about June 2019 to in or about January 2022, in Thailand, Indonesia, Japan, Myanmar, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

10.   It was a part and an object of the conspiracy that TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof controlled substances, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

11.   It was further a part and an object of the conspiracy that TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute controlled substances, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

12.   The controlled substances that TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof, and (b) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, were (i) 500 grams and

more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Section 960(b)(1)(H), and (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 960(b)(1)(A).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

## COUNT FIVE
### (Conspiracy to Possess Firearms, Including Machineguns and Destructive Devices)

13. From at least in or about June 2019 to in or about January 2022, in Thailand, Indonesia, Japan, Myanmar, Denmark, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

14. It was a part and an object of the conspiracy that TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and others known and unknown, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics importation conspiracy charged in Count Four of this Complaint, would and did knowingly use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## COUNT SIX
### (Money Laundering)

15. From at least in or about October 2021 to in or about November 2021, in the Southern District of New York, Japan, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United

States, TAKESHI EBISAWA, the defendant, who is expected to be first brought to and arrested in the Southern District of New York, (a) transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place inside the United States to and through a place outside the United States, and aided and abetted the same, with the intent to promote the carrying on of specified unlawful activity, to wit, the proceeds of the sale, distribution, and importation of a controlled substance, in violation of Title 21, United States Code; and (b) with the intent to (i) promote the carrying on of that specified unlawful activity and (ii) conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of that specified unlawful activity, conducted and attempted to conduct, and aided and abetted the same, financial transactions involving property represented to be the proceeds of that specified unlawful activity, and property used to conduct and facilitate that specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2), 1956(a)(3), 1956(f), 2, and 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

16.  I have been a DEA Special Agent since 2015. I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities, including international narcotics trafficking and weapons trafficking. During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics and weapons traffickers operate, and I have participated in numerous investigations involving international narcotics and weapons trafficking. This affidavit is based upon my participation in the investigation of this matter, including my conversations with law enforcement agents and other individuals, my review of photographs and recorded communications, and my review of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where

figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

17. As set forth below, since at least in or about 2019, the DEA has been investigating TAKESHI EBISAWA, the defendant, who is a leader of the Yakuza[1] transnational organized crime syndicate, in connection with large-scale narcotics and weapons trafficking. Over the course of the investigation, EBISAWA introduced an undercover DEA agent ("UC-1"), posing as a narcotics and weapons trafficker, to certain individuals in EBISAWA's extensive international criminal network, which spans Japan, Thailand, Myanmar, Sri Lanka, and the United States, among other places, for the purpose of arranging large-scale narcotics and weapons transactions. EBISAWA, and his associates SOMPHOP SINGHASIRI, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, have negotiated three sets of narcotics and weapons transactions, as described in greater detail below.

18. First, TAKESHI EBISAWA, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, conspired to broker the purchase from UC-1 of United States-made surface-to-air missiles ("SAMs") as well as other weaponry, for at least two different ethnic insurgent groups in Myanmar, the Shan State Army[2]

---

[1] Based on my training, experience, participation in this investigation, and review of publicly available sources, I am aware that the Yakuza is a highly-organized, transnational Japanese criminal network comprised of multiple crime syndicates, with affiliates in Asia, Europe, and the Americas. The Yakuza are involved in various criminal activities, including weapons trafficking, prostitution, human trafficking, drug trafficking, fraud, and money laundering.

[2] Based on my training, experience, participation in this investigation, and review of publicly available sources, I am aware that the Shan State Army – South, also known as the "Shan State Army," is one of the largest ethnic insurgent groups in Myanmar. The Shan State Army operates throughout the Shan State region of Myanmar. Until February 2014, a particular individual ("CC-1") led the Shan State Army. CC-1 is currently the chairman of the Restoration Council of Shan State, which is the political arm of the Shan State Army. The Shan State Army is frequently in armed conflict with both the Myanmar government and other ethnic armed groups in Myanmar.

and Karen National Union[3] ("KNU"), and to accept large quantities of narcotics for distribution as partial payment for the weapons. EBISAWA, JULLANAN and RUKRASARANEE understood the weapons to have been manufactured in the United States and taken from United States military bases in Afghanistan; they also understood that the narcotics would be distributed in the New York market.

19. Second, TAKESHI EBISAWA and SOMPHOP SINGHASIRI, the defendants, conspired to sell hundreds of kilograms of methamphetamine and heroin to UC-1 for distribution in New York. In furtherance of that transaction, on or about June 16, 2021 and on or about September 27, 2021, SINGHASIRI provided samples of approximately one kilogram of methamphetamine and approximately 1.4 kilograms of heroin.

20. Third, TAKESHI EBISAWA, the defendant, conducted the international transfer of $100,000 USD of purported narcotics proceeds. Law enforcement deposited the funds in New York in bank accounts under EBISAWA's or EBISAWA's associates' control. EBISAWA later withdrew Yen in Japan, kept a commission, and provided the remainder to a purported associate of UC-1 in Tokyo, Japan as purported payment for transporting narcotics for UC-1.

**The Investigation**

21. Based on my involvement in this investigation, including my review of recorded calls, meetings, and electronic communications involving UC-1, confidential sources, TAKESHI EBISAWA, SOMPHOP SINGHASIRI, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, as well as the defendants' associates and co-conspirators, and draft transcripts, translations, and summaries of such communications; my review of DEA and foreign law enforcement reports, records, photographs, and videos; and my conversations with UC-1 and other law enforcement

---

[3] Based on my training, experience, participation in this investigation, and review of publicly available sources, I am aware that the Karen National Liberation Army ("KNLA") is the military wing of another ethnic insurgent group in Myanmar, known as the Karen National Union or "KNU." The KNLA operates primarily in the eastern region of Myanmar. The KNLA is frequently in armed conflict with both the Myanmar government and other ethnic armed groups in Myanmar.

officers, as well as confidential sources; I have learned the following, in substance and in part:

**Initial Weapons and Narcotics Discussions with EBISAWA**

        a.   In or about June 2019, a confidential source ("CS-1"),[4] acting at the direction of law enforcement, met with a Yakuza member known to CS-1 as "Ebisawa,"[5] later identified as EBISAWA, a Japanese national, as well as EBISAWA's associate ("CC-2"), in Tokyo, Japan. At the meeting, which was surveilled by law enforcement agents, EBISAWA told CS-1 that a rebel group in Myanmar (believed by law enforcement, as set forth below, to be the United Wa State Army[6]) was fighting against the government of Myanmar and was looking for weapons. EBISAWA also told CS-1 that the rebel group produced and could supply CS-1 with as much methamphetamine and heroin as CS-1 needed.

        b.   CS-1 subsequently introduced EBISAWA to UC-1, who was posing as a narcotics and weapons trafficker. UC-1, CS-1, and EBISAWA met in or about September 2019 in Bangkok, Thailand, and in or about November 2019 in Bali, Indonesia, to discuss potential narcotics and weapons transactions. At these meetings, which were conducted principally in English and portions of which were audio-recorded, EBISAWA offered to broker the sale of

---

[4] CS-1 has been a paid informant for the DEA since approximately 2016. Before working for law enforcement, CS-1 was engaged in narcotics trafficking and served a prison term for smuggling marijuana. The information provided by CS-1 has been reliable and has been corroborated by independent evidence, including recorded communications, meetings, and other records described herein.

[5] UC-1 subsequently met EBISAWA on several occasions, including (as discussed below) in or about September 2019, November 2019, and February 2021, and has confirmed that the person whom UC-1 met is the same individual pictured on the Japanese passport of EBISAWA.

[6] Based on my training, experience, participation in this investigation, and review of publicly available sources, I am aware that the Wa State is a semi-autonomous region of Myanmar controlled by the armed ethnic organization the United Wa State Army. The region is heavily involved in narcotics production. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), has designated the United Wa State Army as a Specially Designated Narcotics Trafficker/Kingpin under the Foreign Narcotics Kingpin Sanctions Regulations, 31 C.F.R. part 598.

narcotics to, and the purchase of weapons, including SAMs, from, UC-1. EBISAWA used "bamboo" as a code word to refer to weapons during the negotiations. EBISAWA explained that EBISAWA was at that time looking for firearms, explosives, and other weapons to supply (1) the "Wa State," which was fighting the government of Myanmar, and (2) the "Khmer Tiger,"[7] which was fighting the government of Sri Lanka. EBISAWA also advised UC-1 that EBISAWA could supply methamphetamine produced by the Wa State to UC-1. UC-1 told EBISAWA that UC-1 was able to supply weapons to EBISAWA, and that UC-1 was interested in obtaining narcotics for sale in New York. EBISAWA also informed UC-1 that EBISAWA was already supplying or planning to supply marijuana to a distributor in Florida. In subsequent telephonic and electronic communications, EBISAWA and UC-1 discussed pricing, transport, and inspection of narcotics and weapons.

### Methamphetamine and Heroin Transactions with SINGHASIRI and EBISAWA

c.    In or about February 2020, EBISAWA informed CS-1 that a Yakuza leader in Thailand, known as "Sampo," and later identified as SINGHASIRI, a Thai national, had agreed to meet CS-1 and UC-1 to discuss a narcotics transaction.[8] EBISAWA relayed to CS-1 that SINGHASIRI obtained narcotics from the United Wa State

---

[7] Based upon EBISAWA's description of the "Khmer Tiger," and his subsequent references to the "Tamil Tiger" described below, as well as my training, experience, participation in this investigation, and review of publicly available sources, I believe that EBISAWA was referring to the Liberation Tigers of Tamil Eelam ("LTTE"), also known as the "Tamil Tigers." The LTTE was an armed separatist group based in northeastern Sri Lanka. Though defeated militarily in 2009, the LTTE continues to attract international financial support. On October 8, 1997, the United States Secretary of State designated LTTE as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated LTTE as a Specially Designated Global Terrorist under Executive Order 13224. The Secretary of State has also listed the following aliases for LTTE: Tamil Tigers, Ellalan Force, and LTTE. To date, LTTE remains a designated FTO.

[8] Law enforcement agents subsequently surveilled SINGHASIRI at a meeting with a different confidential source ("CS-2") on or about June 16, 2021, as described in further detail below, and confirmed that the person who was present at that meeting is the same individual pictured on the Thai passport of SINGHASIRI.

Army and had a large load of heroin and methamphetamine available for purchase in Phuket, Thailand. CS-1 told EBISAWA that CS-1 and UC-1 were interested in purchasing a sample of narcotics to test in the New York market.

       d.   In or about March 2020, CS-1 met with SINGHASIRI in Bangkok, Thailand. At the meeting, which was recorded and was surveilled in part by law enforcement agents, SINGHASIRI told CS-1 that SINGHASIRI shipped heroin to the United States in rice and noodle boxes, shipped methamphetamine to Australia, and was supplied by the Wa State. CS-1 provided SINGHASIRI with the phone number of UC-1 and asked SINGHASIRI to contact UC-1 directly regarding a potential narcotics transaction.

       e.   In or about June 2020, SINGHASIRI contacted UC-1 over the encrypted messaging application Signal to discuss the narcotics transaction. In a series of Signal phone calls, at least some of which were recorded, SINGHASIRI agreed to provide UC-1 with one-kilogram samples of heroin and methamphetamine, so that UC-1 could test the narcotics in the New York market. SINGHASIRI and UC-1 agreed that if the samples performed well in the New York market, then UC-1 would make a larger purchase of narcotics for distribution in the United States. For example, on or about June 13, 2020, UC-1 told SINGHASIRI, on a recorded call over Signal, that after UC-1 obtained "from you . . . , the 2 samples, 2 kilos" and confirmed that the customers in New York were satisfied, UC-1 would meet SINGHASIRI and "discuss a larger business deal," to which SINGAHSIRI responded, "Ok, super."

       f.   Over the course of the next year, UC-1, CS-1, SINGHASIRI, and EBISAWA continued to discuss the narcotics transaction in numerous telephonic and electronic communications. UC-1 explained that the deal was delayed due to travel limitations caused by the COVID-19 pandemic. For example, on or about December 21, 2020, UC-1 told SINGHASIRI on a Signal audio call, which was recorded, that "there is no travel for us because they are not allowing anybody from the U.S. to come to Thailand." SINGHASIRI acknowledged that travel conditions were difficult, but urged UC-1 and CS-1 to meet him in Thailand "quickly" so that they could "do everything."

       g.   In or about June 2021, through a series of telephonic and electronic communications, which were recorded, UC-1, CS-1, SINGHASIRI, and EBISAWA made arrangements to complete the purchase of a narcotics sample. For example, on or about June 9, 2021, UC-1, CS-1, EBISAWA, and SINGHASIRI participated in a conference call over the encrypted application WhatsApp, which was recorded. On the call, SINGHASIRI confirmed that he had "ice cream"

and "cake," which were code words used by SINGHASIRI and UC-1 during the negotiations to discuss heroin and methamphetamine, respectively. UC-1 confirmed that UC-1 would purchase one kilogram of heroin and one kilogram of methamphetamine as samples to test the New York market, and advised that UC-1 would send a transporter to pick up the samples in Thailand.

h.   On or about June 16, 2021, CS-2,[9] acting at the direction of law enforcement, met SINGHASIRI and an associate of SINGHASIRI ("CC-3") at a hotel in Bangkok, Thailand (the "Hotel"). At the meeting, which was captured on Hotel video surveillance and surveilled by law enforcement, SINGHASIRI, CC-3, and CS-2 sat down together. CC-3 gave CS-2 a small packet. CS-2 then opened a bag, pulled out a bundle of approximately $6,450 USD in cash, and handed the cash to CC-3. CS-2 left and gave law enforcement agents the packet that CS-2 had received from CC-3. A DEA lab subsequently tested the contents of the packet, which contained approximately 979 grams of methamphetamine hydrochloride at approximately 98% purity. SINGHASIRI later provided heroin during a subsequent controlled purchase, as set forth below.

i.   Over the next several months, UC-1, SINGHASIRI, and EBISAWA continued to discuss the narcotics transaction in numerous telephonic and electronic communications. For example, UC-1 and SINGHASIRI participated in Signal calls, at least some of which were recorded, during which (i) on or about August 15, 2021, SINGHASIRI stated that the transportation costs for transporting 500 kilograms of narcotics would be $100,000 USD, and confirmed that SINGHASIRI would first send 20 kilograms as a test; and (ii) on or about September 10, 2021, SINGHASIRI and UC-1 discussed the arrangements for the one-kilogram heroin sample, including that the transaction would occur in the garage at the Hotel. On or about September 9, 2021, UC-1 and EBISAWA participated in a call over the encrypted application Telegram, which was recorded, in which UC-1 informed EBISAWA that SINGHASIRI had provided only "the gold" sample and that if "the diamond" sample was acceptable to UC-1's New York customers, the "500 kilo" deal could proceed. SINGHASIRI, EBISAWA, and UC-1 used "gold" and "diamond" as code words to discuss methamphetamine and heroin, respectively, during the negotiations of the narcotics

---

[9] CS-2 has been a paid informant for the DEA since approximately 2013. Before working for law enforcement, CS-2 was engaged in narcotics trafficking. The information provided by CS-2 has been reliable and has been corroborated by independent evidence, including the surveillance and narcotics seizures described herein.

transaction. EBISAWA asked whether "the gold and the diamond" were "both to send to America," and UC-1 confirmed both types would be sent to New York.

j.   On or about September 15, 2021, at the direction of law enforcement, CS-2 transferred approximately 110,000 Thai Baht ("THB") (approximately $3,500 USD) to an account that SINGHASIRI had previously provided to UC-1, to pay the drug courier for the heroin sample.

k.   On or about September 27, 2021, CS-2, acting at the direction of law enforcement, met SINGHASIRI in the garage of the Hotel. An associate of SINGHASIRI ("CC-4") arrived thereafter. At the meeting, which was captured on Hotel video surveillance and surveilled by law enforcement, CC-4 handed CS-2 a clear plastic bag containing four packets, and CS-2 handed SINGHASIRI approximately 443,815 THB (approximately $17,000 USD). After CS-2 left, CS-2 gave law enforcement agents the bag that CS-2 had received from CC-4. Law enforcement subsequently determined that the packets contained approximately 1.4 kilograms of an off-white powder-like substance that field tested-positive for heroin.

l.   Later on or about September 27, 2021, UC-1 participated in a WhatsApp call with SINGHASIRI, which was recorded, during which SINGHASIRI confirmed that SINGHASIRI had received the money for the packages and stated that the transaction went well. UC-1 also sent SINGHASIRI a WhatsApp message with photographs of the heroin sample that CC-4 had provided to CS-2 earlier that day, and SINGHASIRI confirmed the photographs depicted the "correct packages." Copies of those photographs and the WhatsApp messages are shown below:



m.     On   or   about   December   21,   2021,   UC-1   and
EBISAWA participated in a Telegram call, which was recorded, during
which  UC-1  asked  EBISAWA  if  SINGHASIRI  needed  "bamboo"  (*i.e.*,
weapons)  for  the  planned  transaction  to  transport  the  "1000
kilograms"   (500   kilograms   of   heroin   and   500   kilograms   of
methamphetamine)   out   of   Myanmar,   and   EBISAWA   responded   that
EBISAWA  believed  the  load  was  already  in  Thailand  but  that  UC-1
should ask SINGHASIRI.

n.     On   or   about   December   27,   2021,   UC-1   and
SINGHASIRI  participated  in  a  Signal  call,  which  was  recorded,
during which SINGHASIRI stated that firearms, including machine
guns,  are  used  to  protect  narcotics  that  SINGHASIRI  brokers;  and
individuals  in  the  narcotics  business  with  SINGHASIRI  might  be
interested  in  buying  weapons  from  UC-1  and  possibly  in  trading
methamphetamine  or  heroin  for  weapons.  SINGHASIRI  also  asked  UC-1
to send "sample model" and "website" so that SINGHASIRI could view
UC-1's weapons inventory. After UC-1 subsequently sent photographs
of   weapons   to   SINGHASIRI   via   Signal,   SINGHASIRI   and   UC-1
participated  in  a  Signal  call,  which  was  recorded,  during  which

14

SINGHASIRI stated that the "top guy," who SINGHASIRI believed may be associated with the United Wa State Army, is interested in purchasing weapons and needs the weapons for "the wilderness in the mountains" and "the staff from him also." Based on my participation in this investigation, and my training and experience, I believe that SINGHASIRI was stating that SINGHASIRI's narcotics supplier needed the weapons for protecting narcotics and also for fighting the Burmese government.

### Weapons Deals for Shan State Army and Karen National Union with EBISAWA, JULLANAN, and RUKRASARANEE

#### *The Weapons Viewing*

o. On or about September 19, 2020, EBISAWA participated in a WhatsApp audio call with UC-1, which was recorded. During the call, EBISAWA told UC-1 that the "Tamil Tiger" (*i.e.*, the LTTE) wanted to buy "bamboo" (*i.e.*, weapons). UC-1 responded "Oh, they want weapons?," and EBISAWA answered "Yes." EBISAWA added that EBISAWA had known the leader of the LTTE for 15 years, and that the leader had been imprisoned twice in India because he "control[s] the suicide bomb." EBISAWA asserted that EBISAWA "had a lot of money for him then I release him" from prison in India, which I understand to mean that EBISAWA had obtained the LTTE leader's release. In subsequent electronic and voice conversations, EBISAWA continued to ask UC-1 and CS-1 to supply weapons, including SAMs, rockets, machine guns, and automatic weapons for the LTTE. EBISAWA agreed to travel to Copenhagen, Denmark, in order to view some of the weapons that UC-1 purportedly had available.

p. On or about February 3, 2021, as arranged during their discussions, EBISAWA and an associate of EBISAWA ("CC-5") met with UC-1 and two undercover agents from the Denmark Police who were posing as UC-1's associates, at a warehouse in Copenhagen. At the meeting, which was surveilled by law enforcement and video-recorded, EBISAWA and CC-5 handled and inspected an array of U.S. Army weapons made available by the agents, including three portable M72 light anti-tank rocket weapons, ten 7.62 M60 machine guns, and ten 5.56 Colt Canada C8 fully automatic rifles. In addition, the undercover agents showed EBISAWA and CC-5 photographs and video of 400 U.S. Army surface-to-air Stinger missiles purportedly stored

at a nearby bunker.[10] A photograph of EBISAWA handling a rocket
launcher at the meeting follows below:



*Shan State Army*

q.   After the meeting in Copenhagen, UC-1 and
EBISAWA held a series of phone calls over WhatsApp, at least some
of which were recorded. EBISAWA told UC-1 that EBISAWA would be
traveling to Sri Lanka to talk to the buyers about the weapons
transaction. EBISAWA also told UC-1 that the political situation
in Myanmar was deteriorating, and that the United Wa State Army
was interested in purchasing large quantities of weapons from UC-

---

[10] The FIM-92 "Stinger" is a homing SAM developed by a certain
U.S.-based company, which manufactures the missiles.

16

1.[11] Based on my review of publicly available sources, I know that in early February 2021, the Myanmar military took control of the government and arrested many of the elected civilian leaders.

        r.   On or about May 9, 2021, EBISAWA sent UC-1 a WhatsApp message with a list of weapons that EBISAWA wished to order, including SAMs. The order list is shown below:



        s.   Later on or about May 9, 2021, UC-1, CS-1, and EBISAWA held a conference call over WhatsApp, which was recorded. On the call, EBISAWA stated that the weapons order list was for a rebel general in Myanmar. EBISAWA advised that the general needed

---

[11] After around this point in time, EBISAWA and UC-1 prioritized discussing selling weapons to the Burmese ethnic insurgent groups described herein rather than to the Tamil Tigers, but have continued some conversations regarding a potential deal with the Tamil Tigers.

the weapons to support the United Wa State Army[12] and the Shan State Army in a civil war against the current military government in Myanmar. On or about May 12, 2021, EBISAWA sent UC-1, over Signal, a photograph of CC-1 (a leader of the Shan State Army, as described above in note 2) listing CC-1's name and stating "He is a buyer's boss," and "No 1." The next day, on or about May 13, 2021, EBISAWA held a voice call with UC-1 over Signal. During the call, EBISAWA confirmed, among other things, that the buyer of the weapons was CC-1. I therefore believe that EBISAWA was arranging to purchase the weapons, including SAMs, for use by the Shan State Army.

    t.   In or about May 2021, UC-1 and EBISAWA exchanged numerous text messages and held numerous calls over WhatsApp and Signal, at least some of which were recorded. Among other things, EBISAWA and UC-1 agreed upon a list of weapons to be supplied in the transaction, which included 10 FIM-92J Stinger SAM launchers. EBISAWA and UC-1 also discussed the logistics of the delivery of the weapons to northern Myanmar. EBISAWA advised UC-1 that the buyers would build an airstrip to receive delivery of the weapons by cargo plane, and provided the coordinates for the airstrip location.

    u.   In or about May 2021, EBISAWA introduced UC-1, via WhatsApp and Telegram, to two additional brokers working on behalf of CC-1: (1) JULLANAN,[13] whom EBISAWA described as a Thai Air Force general, and (2) RUKRASARANEE,[14] whom EBISAWA described as a retired Thai military officer. In subsequent voice and text communications over WhatsApp, Telegram, and Signal, RUKRASARANEE discussed the specifics of the weapons order, and JULLANAN coordinated the logistics of delivery. For example, on or about

---

[12] After around this point in time, the individuals described herein primarily discussed supplying weapons to the Shan State Army, rather than to the United Wa State Army, but have continued some conversations regarding a potential deal with the United Wa State Army.

[13] Law enforcement subsequently identified JULLANAN based on a phone number JULLANAN used to communicate with UC-1, and UC-1 has confirmed that the person whom law enforcement identified is the same individual who participated in the videoconference calls described below.

[14] When communicating with the parties over WhatsApp, RUKRASARANEE initially included his full name in his WhatsApp profile. RUKRASARANEE later removed his surname.

May 27, 2021, EBISAWA forwarded to UC-1 and CS-1, via Signal, two screenshots of a conversation with RUKRASARANEE, in which RUKRASARANEE asked, "What type & model of the SAM?" "FIM92J or IGLA-S?" "In the pic. What is the type? FIM Stinger – each set come with? IGLA-S..price per missile or per set?" As another example, on or about June 11, 2021, UC-1, CS-1, EBISAWA, JULLANAN, and RUKRASARANEE held a WhatsApp audio conference call, which was recorded, during which JULLANAN inquired about the weight capacity of the cargo planes that would be dropping off the weapons. On or about August 5, 2021, UC-1, CS-1, EBISAWA, JULLANAN, RUKRASARANEE, and CC-1,[15] and certain of their associates, participated in a video conference call via Telegram, which was recorded. During this call, the CC-1 was introduced and the parties exchanged pleasantries.[16]

       v.    On or about August 28, 2021, UC-1, CS-1, EBISAWA, JULLANAN, RUKRASARANEE, and CC-1, and certain of their associates, participated in another recorded video conference call via Telegram. During the call, UC-1 thanked CC-1 for his weapons business. CC-1 stated, as translated by JULLANAN, that he was looking forward to meeting UC-1.

### *Karen National Union*

       w.    In or about August 2021, EBISAWA informed UC-1 that another rebel group in Myanmar, KNU, was also interested in purchasing large quantities of weapons from UC-1, and that as with the Shan State Army, EBISAWA, JULLANAN, and RUKRASARANEE would broker the weapons transaction with KNU.

       x.    Over the next several months, UC-1, CS-1, EBISAWA, JULLANAN, and RUKRASARANEE, and certain of their associates, discussed the potential weapons deal for KNU. For example, on or about August 31, 2021, UC-1, CS-1, EBISAWA, JULLANAN, and RUKRASARANEE held a conference call over Telegram, which was recorded. During the call, JULLANAN stated that he would be "meeting with the KNU" the following day, and that he expected "a substantial size order" of "maybe close to $40 million US," including "a lot of SAMs."

---

[15] UC-1 recognized CC-1 from publicly available photographs of CC-1. CC-1 is the former leader of the Shan State Army and current leader of the Restoration Council of Shan State, as set forth above.

[16] JULLANAN acted as a translator during the call for CC-1, who did not speak English.

y.   Also on or about August 31, 2021, UC-1, CS-1, EBISAWA, JULLANAN, RUKRASARANEE and two individuals whom JULLANAN introduced as high-ranking KNU military officers ("CC-6" and "CC-7") held a videoconference over Telegram, which was recorded. JULLANAN also stated that the meeting had been "very successful" and KNU "want[ed] to place an order."

z.   On or about September 29, 2021, in messages sent through Telegram, UC-1, CS-1, EBISAWA, JULLANAN, and RUKRASARANEE continued discussing KNU's potential weapons order. UC-1 sent the group a message with photographs of SAMs. JULLANAN responded, "Thank you for the photos. Are these the US Stinger?" and informed the group that JULLANAN had "already forwarded to" CC-6.

aa.   On or about November 29, 2021, UC-1, CS-1, EBISAWA, JULLANAN, and RUKRASARANEE participated in a Telegram conference call, which was recorded, during which they discussed both the KNU and Shan State weapons deals, including the following:

i.   UC-1 stated that through contacts in Iran, UC-1 had obtained U.S. military-grade weapons left behind at U.S. military bases in Afghanistan, including approximately 45-50 Stinger SAMs and other primarily U.S.-made weapons. JULLANAN stated that Shan State and KNU "prefer U.S.-made [SAMs and weapons generally] but also open to other models from other countries." EBISAWA, JULLANAN and RUKRASARANEE were all on the line during this portion of the call, as well as the other portions described below.

ii.   EBISAWA asked about the "option for the KNU payment" in "sugar," a code word the chat participants had previously used to discuss heroin. Based on my training, experience, and participation in this investigation, I believe that EBISAWA was asking if KNU could make a portion of its weapons payment with heroin. UC-1 agreed, explaining that after receiving the weapons by cargo plane, the KNU could load the same plane with drugs, which would then be shipped to New York for distribution. UC-1 stated that the group on the conference call could share a fraction of the profits from the narcotics sales, which were expected to be substantial due to the market price of heroin in New York. JULLANAN" stated that he would ask the KNU leaders about "the sugar" (*i.e.*, heroin), "the salt" (a code word the chat participants had previously used to discuss methamphetamine), "or other products," that JULLANAN was "getting goosebumps just hear of the price difference," and that KNU should be able to provide "at the metric tons level."   RUKRASARANEE stated the quality of the product is "good" and one "can't find better in this region."

UC-1 subsequently stated that UC-1 had "a couple of customers in New York" who would want to sample the product.

bb.   On or about December 12, 2021, UC-1, JULLANAN, RUKRASARANEE, and CC-6 participated in a video conference call via Telegram. During this call, JULLANAN, who was together with CC-6 for the call, explained to the group that JULLANAN and CC-6 had just discussed a 20 percent deposit for the weapons; that CC-6 wanted to see the weapons prior to purchase; and that JULLANAN had asked CC-6 about the heroin and methamphetamine, and that CC-6 said he would get back to the group. CC-6 responded "ok" when UC-1 suggested that CC-6 provide "a few of them in advance" so that UC-1's customers could "test it" and "everything will be great here in the U.S." Based on my training, experience, and participation in this investigation, I believe that CC-6 agreed to provide a sample of the narcotics ("a few of them") so that UC-1 could confirm the quality of the drugs in anticipation of the weapons-for-drugs transaction.

**Money Laundering by EBISAWA**

cc.   On or about October 14, 2021, EBISAWA participated in a WhatsApp call with UC-1, which was recorded. During the call, UC-1 informed EBISAWA that UC-1 was brokering a shipment of around 100 kilograms of narcotics from Mexico to Japan, and from Japan to another country, and that UC-1 needed to pay the Japan-based transporter approximately $100,000 USD for this deal. UC-1 asked EBISAWA to receive UC-1's narcotics proceeds and pay the purported transporter in Japan, and also stated that EBISAWA would receive a commission. EBISAWA agreed but told UC-1 that he wanted to speak with his bank about the details.

dd.   Over the course of the next several weeks, EBISAWA and UC-1 discussed the contours of the transaction over several recorded calls, during which EBISAWA agreed to pick up cash in New York, New York, and subsequently deliver cash in Japan to the purported narcotics transporter. On or about November 15, 2021, during a WhatsApp group chat with UC-1, EBISAWA, and an associate of EBISAWA who referred to himself as "Beam," "Beam" requested that UC-1 provide "the person's name & contact number who going to handover the cash to the my collection people." In response, UC-1 provided the contact information for a confidential source ("CS-3")[17] who was posing as an associate of UC-1 in New

_____

[17] CS-3 was indicted on a federal narcotics offense in 2018 and is cooperating with law enforcement in the hope of receiving leniency at sentencing. Before working for law enforcement, CS-3 was convicted of two narcotics trafficking offenses. The information

York, and would deliver cash to EBISAWA's associate in New York. On or about November 18, 2021, UC-1 also provided EBISAWA the contact information for a confidential source ("CS-4") in Japan,[18] who was posing as UC-1's transporter.

        ee.  On or about November 20, 2021, CS-3, acting at the direction of law enforcement, received a phone call, which was recorded, from an individual who introduced himself as "Beam" and said he was provided CS-4's number by UC-1 for "getting the transaction of the $100,000." On or about November 21 and 23, 2021, in subsequent WhatsApp messages between CS-3 and "Beam," CS-3 told "Beam" that he was in New York, New York, and agreed to deposit cash in "Beam's" bank accounts instead of delivering cash to "Beam's" associate in New York. "Beam" then provided CS-3 with U.S. bank account information for three accounts that "Beam" purported to control (the "Beam Accounts"). DEA agents thereafter transferred a total of $100,000 USD, which first passed through a financial account in New York, New York, into the Beam Accounts. A short time later, CS-3 sent "Beam" a photograph of the wire transfer confirmation by WhatsApp messenger, and "Beam" subsequently confirmed receipt of funds.

        ff.  On or about November 29, 2021, CS-4, acting at the direction of law enforcement, received a phone call from EBISAWA, which was recorded, who informed CS-4 that EBISAWA was ready to deliver the money to CS-4. In subsequent text messages, EBISAWA and CS-4 arranged to meet at a particular train station in Tokyo later that day. At the meeting, which was surveilled by law enforcement agents, EBISAWA handed CS-4 a plastic bag later determined to contain approximately 9,850,000 in Japanese Yen (the equivalent of approximately $84,913.79 USD). While in CS-4's presence, EBISAWA called UC-1 and handed the phone to CS-4 in order to provide confirmation that the transaction had occurred, and such communication was recorded. Based on my review of communications between EBISAWA and UC-1, in which they discussed EBISAWA retaining a portion of the $100,000 USD as a commission

---

provided by CS-3 has been reliable and has been corroborated by independent evidence, including the communications described herein.

[18] CS-4 has been a paid informant for the DEA since approximately 2006. Before working for law enforcement, CS-4 overstayed his visa in the United States. The information provided by CS-4 has been reliable and has been corroborated by independent evidence, including the surveillance and seizure of purported narcotics proceeds described herein.

for facilitating the transaction described above, as well as my training and experience, I believe that approximately $15,086.21 USD (the difference between $100,000 USD and $84,913.79 USD, which constitutes approximately 15 percent of $100,000 USD) represents EBISAWA's commission for carrying out the money laundering transaction.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of TAKESHI EBISAWA, SOMPHOP SINGHASIRI, SUKSAN JULLANAN, a/k/a "Bobby," and SOMPAK RUKRASARANEE, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

FURTHER, the Government respectfully moves for this Complaint and the arrest warrants to remain sealed, with the exception that the Complaint and arrest warrants are unsealed for the limited purpose of disclosing the existence of or disseminating the Complaint and/or arrest warrants to relevant United States, foreign, or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendants or to secure the defendants' arrests or extraditions, or as otherwise required for purposes of national security.


                              /s Thomas P. McLaughlin (By Court with Auth)
                              _____
                              THOMAS P. McLAUGHLIN
                              Special Agent
                              Drug Enforcement Administration



Sworn to me through the transmission of this
Complaint by reliable electronic means,
pursuant to Federal Rule of Criminal Procedure 4.1,
this 19th day of January, 2022


_____
HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK